EX–CELL–O CORPORATION, Plaintiff,

v.

LITTON INDUSTRIAL PRODUCTS,
INC., et al., Defendants.

No. 5–71654.

United States District Court,
E. D. Michigan, S. D.

Sept. 26, 1979.

Edward W. Osann, Jr., Chicago, Ill., and James H. Bower, Troy, Mich., for plaintiff.

B. C. Foussianes, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This action was commenced on August 25, 1975, by plaintiff Ex-Cell-O Corporation which seeks a declaratory judgment that United States Letters Patent 3,709,623 is invalid and unenforceable. The defendants in this action, Litton Industries, Inc., and its wholly owned subsidiary, Litton Industrial Products, Inc., the latter being the current owner of the patent in suit, have filed a counterclaim for preliminary and final injunctive relief against the infringement of this patent by the plaintiff.

Following extensive discovery, the plaintiff made a motion for a summary judgment contending that the patent in suit was invalid under 35 U.S.C. § 102(b) because the invention was "on sale" more than one year prior to filing of the patent application. In the alternative, the plaintiff maintained that several claims of the patent were invalid for late claiming. In response to this motion, the defendants also moved for a summary judgment that the patent in suit was not invalid on the basis of the "on sale" and late claiming defenses. On October 10, 1978, the Court entered an order denying both of these motions. The Court did, however, grant the plaintiff's motion pursuant to F.R.C.P. 42(b) for a prior and separate trial of the "on sale" and late claiming issues. This opinion represents the Court's findings of fact and conclusions of law based upon the evidence presented at that prior and separate trial.

## I. INTRODUCTION

The patent in suit issued on January 9, 1973, on the application of Hollis N. Stephan and Leslie C. Seager. This application, Serial No. 46,401, is a continuation of abandoned parent application Serial No. 25,118 originally filed on April 27, 1960. At the time of the original application Stephan, now deceased, was an employee of the Lucas Machine Division of The New Britain Machine Company, Inc. and Seager was an employee of one of Lucas' customers, the Eimco Corporation of Salt Lake City, Utah. Both the original and the continuation applications were assigned to New Britain which was later acquired by defendant Litton Industrial Products.

The patent in suit relates to a conventional, automatically controlled boring, drilling and milling machine with automatic tool changing capability. The machine as described in the preferred embodiment set forth in the patent has a column mounted on a bed. Attached to the column is a vertically movable spindlehead, which includes a power driven rotatable spindle. Also mounted on the bed is a saddle capable of relative movement toward and away from the spindle or column. Mounted on the saddle is a work table capable of movement transversely of the axis of rotation of the spindle.

The machine has a tool rack or magazine with an assortment of tools which is mounted on the work table. Electronically controlled power drives move the spindle, spindlehead, saddle and work table relative to one another and this existing relative movement is utilized to effect a tool change. The machine changes tools by stopping the spindle in a single predetermined angular position, moving the magazine horizontally and the spindle vertically to align the spindle with a tool holding aperture in the magazine, and then moving the spindle axially to engage or disengage a tool in the magazine.

The movements of the spindlehead, work table and saddle are generally referred to in the trade as movements along a particular axis. For example, in a horizontal machine such as that set forth as the preferred embodiment of the patent in suit, the vertical movement of the spindlehead is referred to as movement along the Y axis; the movement of the saddle toward and away from the column or spindle is referred to as movement along the Z axis; and the movement of the work table transversely of the axis of rotation of the spindle is referred to as movement along the X axis.

These relative movements are produced in the machine described in the patent in suit by a system known as numerical control.[1] In such a system instructions for the movement of the machine parts and the performance of machining operations is written or punched on tape or cards. These instructions are then read mechanically and transmitted to the machining center. As a result, the machining center is able to automatically complete a number of operations requiring different tools.

Numerical control systems can be used to produce movements along any number of axes. Consequently, the number of axes of

---

[1]. A specific numerical control system is not an element of the claims of the patent.

relative movement is often used as a modifier of the control system. For example, a control system producing three axes of movement would be referred to as a three-axis numerical control system.

It is clear to the Court that the ability to change tools automatically through the use of a system of numerical control was old in the art as of the date of the original application for the patent in suit. It is also clear that the plaintiff had been producing machines which had the ability to stop the spindle in a predetermined angular position long before Stephan et al. applied for their patent. One of the principal differences between the machining center described in the patent in suit and those described in the prior art is that the machine described in the patent in suit is able to change keyed tools (tools which have keys designed to fit into keyways in the spindle and which are used to transmit the driving power of the spindle to the tool) automatically by repeatedly inserting the tool into the spindle in the same predetermined angular position. The ability to repeatedly insert the tool in the same angular position with respect to the spindle assures consistency and accuracy in machining operations, not obtainable when tools are inserted in the spindle in a random position.

This distinction between the machine described in the patent in suit and other machines produced in the 1950's is clear from an examination of other patents submitted by the parties. For example, it is clear that prior to the application of Stephan et al. means had been devised for changing keyed tools automatically. However, these means could not insure that a tool would be placed in the spindle in the same predetermined angular position each time. Similarly, some machines possessed the capability of placing a particular tool in the spindle in such a way that the torque (produced by the turning action of the spindle) required to free the tool from whatever tool storing mechanism was employed would insure that the

angular position of the tool in the spindle remained virtually the same for repeated uses. These machines, however, were incapable of changing keyed tools automatically.

With this brief introduction, the Court will now consider the merits of the case along with the various positions advanced by the parties.

## II. ON SALE

The facts relevant to the "on sale" defense may be broadly grouped into two categories. The first category consists of those facts surrounding a transaction between Lucas, the defendants' predecessor, and the Eimco Corporation of Salt Lake City, Utah which transaction is alleged by the plaintiff to constitute a sale of the invention.[2] The second category consists of positions taken by Stephan et al. in proceedings before the Board of Patent Interferences and the Patent Office with respect to the legal significance of this transaction and the facts surrounding it. The evidence relevant to these two factual categories comes almost exclusively from testimony taken in a mid-1960's interference proceeding where Stephan et al. was one of the parties. In addition, the parties rely on certain documents later submitted to the Patent Office and depositions taken in this action.

Prior to the filing of the original application for the patent in suit, the Eimco Corporation, a longtime customer of Lucas, was in the business of manufacturing crawler tractors and underground mining equipment and had designed a housing for such tractors. All of the machining required to produce these housings was performed by a conventional boring and milling machine, the tools of which were changed manually. Since this was a time consuming process, Eimco was looking for a way to increase its productivity through the purchase of a new boring machine.

2. The term "invention" when used in this opinion is used merely as a reference to the machine developed by the inventors and described in the patent. Its use is not meant to indicate the Court's opinion with respect to the novelty of the device described in the patent or any other issue not specifically decided in this opinion.

Leslie C. Seager, Eimco's chief production engineer at that time, concluded that Eimco was in need of a fully automatic boring mill which could change tools automatically. Seager contacted many machine tool companies but none were able to provide him with a satisfactory proposal for a fully automatic machining center. One of the major hangups appears to have been the reluctance of the companies contacted to meet Seager's requirement that the tooling for the machine was to have the No. 50 National Machine Tool Builders taper driven through keys. As a result of Seager's inability to secure a proposal for the type of machine he felt was needed, Eimco verbally ordered a conventional boring mill from a Lucas competitor, the Bullard Company. The reason that the Bullard Company, rather than Lucas, received this order is that Eimco had become increasingly dissatisfied with Lucas' tools and service and had decided to look elsewhere for its new machine.

In mid-summer 1958, R. E. DuBoc, a distributor for Lucas, learned of Eimco's dissatisfaction and relayed the information to A. J. LeBrun, Lucas' sales manager. On August 8, 1958, LeBrun met with Seager in an attempt to improve Lucas' service and also to convince Eimco to place an order with Lucas. At that meeting, Seager made known his desire for a fully automatic machine with three-axis numerical control and the ability to stop the spindle in the same predetermined angular position so that a keyed tool could be inserted into the spindle in the same relative position each time it was used. Seager and LeBrun also discussed the positioning of a toolholding magazine on the front of the table or on the saddle. At this meeting, Seager made a sketch of the magazine which resembled a box with compartments in it for storing tools. The compartments were to be equipped with detents for holding the tools. Both Seager and LeBrun were of the opinion that numerical control techniques could be used to effect the relative movement of the magazine and spindlehead required for changing tools.

Pursuant to these discussions, Lucas gave Eimco a quotation on August 11, 1958, for a conventional Lucas 542B120 horizontal boring, drilling and milling machine including a spindle with a No. 50 taper. However, the proposal was not satisfactory to Eimco because among other things it included provision for two-axis numerical control rather than the three-axis control that Seager wanted. One of the reasons for this deficiency was that Lucas had no experience with three-axis control systems, and therefore was unable to determine the price of the machine Seager had outlined.

On August 26 and 27, 1958, Seager and Mr. James Campbell, superintendent of Eimco at that time, visited the Lucas plant in Cleveland, Ohio, at the suggestion and invitation of LeBrun. During this visit Seager met with coinventor Stephan, Wilbur Meinke, Lucas' chief engineer and a representative of General Electric (supplier of Lucas' numerical control equipment). Seager made it clear at this meeting that he was interested in a machine with automatic tool changing capabilities which could stop the spindle in a predetermined angular position for tool changing and which had three-axis numerical control. At this meeting it was decided that the magazine would be mounted on the end of the work table. In addition, the discussion dealt with ways of stopping the spindle in the same predetermined angular position. Among the methods discussed were the use of limit switches, latching switches and proximity switches.

At this meeting Seager indicated that he expected Lucas to build the basic machine, but that Eimco would construct the tools and magazine and anything that had to do with tooling. Seager's desire to have Eimco build the tooling stemmed from his belief that Eimco was more experienced in that area and could therefore do a better job.

Although it is apparent that at this time Seager was not interested in a machine with tape control, the record clearly reflects that he was interested in a machine which would have the proper lead screws so that it could be retrofitted for tape control in the future.

After Seager's visit several of those at Lucas, in the words of Meinke, "thought that [they] were biting off more than [they] might chew." Consequently, Meinke and Stephan wanted to prove to themselves that the machine could, in fact, be built and change tools automatically. They therefore had a two station magazine built and simulated a tool changing cycle which demonstrated that the machine could correctly position the spindlehead and magazine for automatic spindle to magazine tool changes. In Meinke's words:

> Manually we oriented the spindle in one position. The positioning of the table and head was done under numerical control. I might say that what we did was to use a two axes controlled machine and then we initiated the saddle motion so that the tools would be brought into the spindle socket and be stopped just a short distance from the stopping place, and then manually we would actuate the power tool ejector mechanism to close the collet, and this would then grab the tool. It would hold the tool, and it would pull the tool out of the magazine and hold the tool, and then we switched back to tape and it would initiate the saddle to retract.
>
> Then, since it was on tape, we had programmed what we call an end bracket, a small bracket about six inches long or maybe ten inches long, six inches wide, and three inches high, that had three holes in it. They would hold the tail end of the saddle feed screw and the table power drive shaft and our back rest shaft. We would proceed to machine these little brackets using the spade drill and the semifinishing and finishing bar, boring bars, and then we would again go through the same combination numerical positioning and hand operation to deposit the tool back in the magazine. We were simulating an actual tool change cycle that eventually evolved into a fully automatic program. Plaintiff's Exhibit 281 at 200–01.

According to Meinke, following this demonstration, "it was just a matter of putting in the proper coding or electronic codes and controls in the machine numerical control system." *Id.* at 202.

On January 30, 1959, Eimco executed a purchase order for a Lucas 542B120 "Precision" Horizontal Boring, Drilling and Milling Machine. Since Lucas was unable to provide Eimco with a quotation on the type of numerical control system desired, the machine described in the purchase order did not have three-axis numerical control. Eimco, however, was still interested in a machine with this feature. As a result, the order specifically stated that the machine would be adaptable for tape or numerical control and would be equipped with the proper lead screws. The purchase order also specified that the machine would have pendant controls for operation of the machining functions. These controls could also be used to control and jog the spindle so that it could be stopped in any desired position.

Despite Seager's emphasis on having a fully automatic machine, it is clear that the machine described in the order was incapable of automatic tool changing. In fact, the order referred to time studies which according to Seager dealt with the speed with which operations could be performed using manual tool changing. However, any notion that the machine being purchased was merely a conventional boring mill is dispelled by a Rule 131 Affidavit filed by Seager in order to overcome a Patent Office rejection of Claims 17 and 18 of the patent in suit. In that affidavit, Mr. Seager stated:

> . . . The Eimco order was prepared under the supervision of the deponent and . . . the order was placed with the clear understanding . . . that the machine would be capable of fully automatic tool changing . . .

Following the execution of the January 30, 1959 purchase order, Seager was invited to the Lucas plant in Cleveland to discuss the machine that had been ordered and the adaptation of numerical control to it. On this date, Seager witnessed a demonstration similar to that conducted earlier by Stephan

and Meinke and discussed above.[3] In the aforementioned Rule 131 affidavit, Seager described this demonstration as follows:

Deponent further states that on February 17, 1959, he visited the Lucas plant and witnessed a demonstration which proved the feasibility of using a clutch-servo numerical controls to accomplish automatic tool changing, and that the demonstration was carried out on a boring machine equipped with two-axis clutch-servo numerical controls for operating the head and table, and that the actuation of the saddle was initiated from tape by a command thereon, and that the saddle positions were controlled by the use of end measuring rods, and that a magazine which held two tools was mounted on the work table of the machine, and that the tools were used to machine a lead screw bracket of the type used on the Lucas machine, and that he observed a tool changing cycle in which a tool from the magazine was mechanically transferred to the spindle and after a machining operation was mechanically returned to the magazine, and that the tape controlled the positions of the head and table in aligning the spindle with a selected one of the tools in the magazine.

Deponent further states that the machine which was demonstrated and tested on February 17, 1959, included a power driven tool spindle which was selectively movable to a plurality of positions, and that the spindle had a rearward end and an operating end, and that a tool carrying magazine was selectively movable to a plurality of positions for presenting a tool at a predetermined position preparatory to engaging with the spindle any one of the tools in the magazine, or returning to the magazine a tool which was carried in the spindle, and further that the machine carried means within the spindle for movement between the two ends of the spindle and for cooperating with the magazine to engage with the spindle a tool from the magazine and to release the

tool prior to the return of the tool from the spindle to the magazine, and that the machine operated successfully and proved the operability of the machine conceived in August, 1958.

Based upon this demonstration, Seager was satisfied that the machining center could be built and operated as contemplated, despite the fact that at the demonstration they were unable to stop the spindle in a predetermined angular position. As a result, Seager proceeded on the assumption that the machine being produced for Eimco would be a fully automatic piece of equipment when it was delivered. In his deposition taken for this case, Seager testified:

[Because of my satisfaction that the system could be built] we gave them an order and said, in fine print, okay, you guarantee that you can retrofit and do all those other good things, so that we can make it a fully automated piece of equipment. Plaintiff's Exhibit 284 at 134.

With respect to Eimco's responsibility to provide the tooling and design the magazine, Seager stated:

Now, we took one risk and one risk only. We spent—I can't give you the dollar figures now—but I would say it was probably fifteen or twenty thousand dollars on magazines and fixtures and tools. Now, had we failed on this thing, we would have then had fifteen or twenty thousand dollars worth of tools, all the tools, which would have been okay. But the magazine and the holding fixtures probably would have been a waste of money. *Id.*

On March 5, 1959, a short time after this demonstration, Eimco executed a change order which deleted some items from and added other items to the January 30, 1959 purchase order. According to Seager, under whose supervision the change order was prepared, the purpose of these changes was to insure that the machine being purchased was properly equipped for automatic tool changing.

---

**3.** The machine demonstrated to Seager was not the one ordered on January 30, 1959. In fact, at the time of the demonstration the machine which would eventually be delivered pursuant to the order was being built elsewhere in the Lucas plant.

On April 28, 1959, Lucas supplied Eimco with a quotation for a General Electric Mark III numerical control device adapted to the Lucas 542B120 machine. This constituted the control device for automatic positioning of the spindlehead, table and saddle necessary for the fully automatic machine capable of automatically changing tools contemplated by Seager. On May 12, 1959, Eimco executed a further change order covering the purchase of the General Electric Mark III. On July 6, 1959, Lucas advised its distributors that the Mark III would be delivered to Lucas 14 to 16 weeks after May 1, 1959.

On July 1, 1959, Seager again visited the Lucas plant to follow up on the progress of the machine order quotation and to discuss further refinements of the numerical control. Subsequent to this visit, Eimco executed a change order dated July 15, 1959, to add an electronic and mechanical conversion program control necessary to orient the spindle. The order discloses that it was in confirmation of an earlier verbal order given by Seager to LeBrun on July 2, 1959. Although this is the first time the actual control mechanism for stopping the spindle was placed in the order, Seager's testimony makes it clear that methods for stopping the spindle had been part of the discussions between Lucas and Eimco since the inception of the order.

While this was going on, Eimco was apparently working on the tooling and the tool magazine in preparation for an upcoming demonstration of the machining center in September, 1959. This is evidenced by a letter from Seager to Lucas dated August 6, 1959, which stated:

We are rushing all tooling on our 103 Main Frame for the Tool Change Magazine and boring bars and we expect to ship both the magazine and tools complete to you in ample time for September 15th, 1959 tryout. Plaintiff's Exhibit 51

Despite this, the tool magazine and tooling for the machine were not shipped by Eimco until October 13, 1959. The magazine, designed by Seager, was built by an Eimco subcontractor. The tools sent to Lucas were the tools necessary to perform the machining operations on one of Eimco's tractor frames.

In late October 1959, the machine was demonstrated to Seager and members of the A.I.E.E. at the Lucas plant in Cleveland. At this demonstration, the center was used to machine a part and performed in a fully automated manner as originally contemplated by Seager. The only problem was a "hunting condition" which existed with respect to the spindle. In other words, the spindle did not always stop in a predetermined angular position on its first revolution, but instead would miss the programmed stop before coming to rest in the desired position in the second revolution. The machining center was eventually shipped to Eimco in late January 1960.

The New Britain Machine Company and Lucas, one of its divisions, began negotiations, apparently sometime in early 1960, to obtain sole patent rights for the invention. As a result of these negotiations, it was agreed that Eimco would not enforce its right to an assignment of Seager's interest in any patent. In exchange for this agreement, Eimco was granted a nonexclusive license to make, use or sell the machines embodying the invention. In exchange for an assignment of his patent rights, Seager was to receive $500 from New Britain.

In addition to the factual information surrounding the development of the invention set forth above, a second category of evidence relevant to the on sale issue must be considered. The evidence concerns the characterization of the transactions between Lucas and Eimco by Stephan et al. in proceedings before the Board of Patent Interferences and the Patent Office.

In 1965 the Patent Office declared an Interference between Stephan et al. and two other parties. A detailed analysis of that proceeding is unnecessary at this point and for present purposes it is sufficient to note that the task of Stephan et al. was to establish the priority of its invention in relation to the inventions of the other parties to the interference. After a great deal of testimony with respect to the facts set

forth above, Stephan et al. sought to characterize these facts in such a way so as to establish the priority of its invention. With respect to the January 30, 1959 purchase order the interference brief of Stephan et al. stated:

> Pursuant to the conception of the invention in August, 1958, Eimco on January 20, 1959 placed a formal order (Steph. Exch. G.) for the 542B120 Lucas machine covered by the LeBrun proposal of August 11, 1958.
>
> . . . There was no doubt in Seager's mind that the Eimco order which was prepared under his supervision contemplated a fully automatic machine including automatic tool changing. The testimony concerning Seager's interpretation of the original order is confirmed by the subsequent change orders which were issued as Lucas was able to quote definite prices on the required equipment. All of the structure called for by the count is covered by Stephan et al. exhibit G except for the tool magazine. The tool magazine was built by Eimco and not by Lucas. Plaintiff's Exhibit 280A, Brief of Stephan, et al. at 35–37.

And with respect to the February 17, 1959 demonstration, the brief stated:

> It is clear from the testimony of both Meinke and Seager that the test on February 17, 1959 demonstrated the practicability and utility of the Stephan et al. invention. Actual machining operations were performed and the tools were selectively transferred to the spindle from the magazine. At the end of a machining operation the spindle was angularly oriented and the tool in the spindle was returned to the magazine in the same predetermined angular position in which it was previously supported therein. The successful demonstration fulfilled all the conditions essential to a reduction to practice and would be urged as such but for the fact that it was overlooked when the preliminary statement was prepared. While the machine that was demonstrated did not have proximity switches for stopping the spindle, as was actually embodied in the Eimco machine in accordance with the conception in 1958, there was no question that the switches would work and an actual use of the switches was not required for a reduction to practice. *Id.* at 38–39.

Later in the prosecution of the Stephan et al. continuation application, the patent examiner rejected Claims 17 and 18 as being fully met by a patent previously issued to Donald Pittwood. In order to overcome the reference to the Pittwood patent, Stephan et al. submitted the Rule 131 affidavit which is quoted extensively above. The amendment to which this affidavit is attached characterized it as "an affidavit under Rule 131 executed by co-inventor Seager stating facts which show a conception prior to December 30, 1958, and a reduction to practice on February 17, 1959."

Based on these facts, the plaintiff claims that the patent in suit is invalid under 35 U.S.C. § 102(b) which provides:

> A person shall be entitled to a patent unless . . . the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Since the original patent application of Stephan et al. was filed on April 27, 1960, the plaintiff bears the burden of showing that the invention was on sale prior to April 27, 1959.

The purpose underlying § 102(b) was aptly set forth by the Court in *Gould Inc. v. United States*, 579 F.2d 571, 580 (Ct.Cl. 1978):

> It appears certain that the purpose of the on sale bar and the 1-year grace period is an attempt by Congress to balance the interests of the inventor with the interests of the public. On the one hand, Congress was concerned that an inventor would have sufficient time to not only determine whether a patent is desired following a sale, but that sufficient time would also be provided to have the patent application prepared and filed

in the Patent Office. On the other hand, Congress was concerned with encouraging inventors to file for a patent as soon as possible and, at the same time, prevent the commercial exploitation of an invention for more than 1 year. Similarly, many courts have acknowledged that § 102(b) was prompted by a concern that unless otherwise restricted to the one year waiting period an inventor might be able to extend the period of his monopoly by commercially exploiting the invention for an indefinite period of time before filing his patent application. *Micro-Magnetic Industries, Inc. v. Advance Automatic Sales, Inc.*, 488 F.2d 771 (9th Cir. 1973); *Koehring Co. v. National Automatic Tool Co.*, 362 F.2d 100 (7th Cir. 1966).

■ The party asserting the "on sale" defense has the burden of proving the defense by clear and convincing evidence. *Minnesota Mining & Mfg. v. Kent Industries*, 409 F.2d 99 (6th Cir. 1969). However, the evidence need not show that there was an actual accomplished sale, since the statutory bar may be triggered by activity of the inventor or his company in attempting to sell the patented idea. *Amphenol Corporation v. General Time Corp.*, 397 F.2d 431 (7th Cir. 1968). For example, in *Red Cross Manufacturing v. Torro Sales Co.*, 525 F.2d 1135, 1140 (7th Cir. 1975), the Court held that the demonstration of the patented invention to the inventor's principal buyer was sufficient to trigger the "on sale" bar and stated the general principle that:

the statutory prescription of § 102(b) is concerned not with the formal requisites of the challenged activity but with its effects.

■ Not all sales trigger the "on sale" bar, however. If the primary purpose of a sale is experimental rather that commercial, the defense does not apply. *Dart Industries, Inc. v. E. I. Dupont de Nemours & Co.*, 489 F.2d 1359 (7th Cir. 1973). The inventor's intent determines whether sales activity is for experimental or commercial purposes. Sales activity ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others. *Red Cross Manufacturing, supra.*

■ As its name implies, the "on sale" defense requires a showing that the invention was the subject of a sales transaction more than one year prior to the filing of the patent application. The defendants contend that the invention was not on sale because the January 30, 1959 purchase order and the proposal which preceded it do not describe a machine which has automatic tool changing capability. Thus, they maintain that the subject of the sale was not the invention, but nothing more than a conventional boring mill. As part of their argument that the machine ordered from Lucas was not the invention, the defendants contend that the agreement with respect to the invention was one whereby Lucas and Eimco would jointly develop the machine which matured into the patent in suit. While these contentions might be properly treated as one issue, i. e., whether the transaction constituted the sale of a conventional machine coupled with an understanding to jointly develop the invention, the Court believes that the arguments presented by the defendants are more easily dealt with separately. Consequently, the Court will first consider whether the transaction between Lucas and Eimco concerned the invention, regardless of whether the transaction involved a joint development. Later, after discussing the reduction to practice issue, the Court will deal with the question of whether the facts of the case warrant a finding that the invention was jointly developed and therefore not "on sale."

■ With respect to the first of these issues, the Court is of the opinion that the record clearly supports a finding that the transaction between Lucas and Eimco was not confined to a conventional boring mill. There is no hint in the testimony of either Seager or the Lucas employees or agents that the transaction in question was limited to a conventional machine. From its very inception, the transaction centered around Seager's desire to have a fully automatic piece of equipment and the efforts of Lucas to meet this desire. The fact that the Janu-

ary 30, 1959 purchase order did not provide for a machine with automatic tool changing capability is not persuasive. A major reason for this, as disclosed by the record, is that Lucas was unable to quote Eimco a price for the Mark III numerical control unit because it had not been produced by General Electric at that time. To hold that the Court is limited in its inquiry to what is stated in the purchase order is to ignore the substance of the transaction. Clearly, the transaction in this case was directed at the invention as originally conceived by the inventors.

Alternatively, the defendants argue that even if the sale did not involve a conventional machine, the device sold could not have been the invention because the magazine, an element of all of the claims of the patent in suit, was furnished by Eimco and was not included in the Lucas-Eimco transaction. The Court is of the opinion that based on the record, this circumstance should not bar the application of § 102(b) to the patent in suit.

■ The defendants' argument with respect to the magazine can be summarized as follows: The patent in suit is a combination patent with the magazine as an element of all of its claims (a fact admitted by the plaintiff's expert). In order for an invention to be "on sale" every element of its claims must be found in the article sold. *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95 (6th Cir. 1975). Therefore, the absence of the magazine is fatal to any argument that the device sold to Eimco satisfied the criteria of § 102(b).

■ The problem with this argument is that it proves too much. As noted above, the purpose of the "on sale" bar is to prevent an inventor from extending his monopoly by commercially exploiting his invention prior to filing an application for a patent. If the "on sale" bar can be avoided merely by permitting or requiring the purchaser to acquire some element of the invention elsewhere, the potential for extending the inventor's monopoly and thus subverting the purpose underlying § 102(b) is apparent. As a result, the Court is of the opinion that the absence of the magazine from the Lucas-Eimco transaction is insufficient to preclude the application of 102(b) in this case.[4]

In addition, the Court has grave doubts that the holding in *Scharmer, supra*, is applicable to the case at bar. In *Scharmer*, the Court was faced with a situation where the patentee was arguing that his invention was not on sale because the sale included elements which were not claimed in the patent. Thus, the *Scharmer* court correctly concluded that if the article sold met the claims of the patent, the fact that an extra unclaimed feature was sold as part of the article does not preclude application of § 102(b). This case clearly involves a different situation and for the reasons stated above requires a different rule.[5] Cf. *Timely Products Corporation v. Aaron*, 523 F.2d 288, 302 (2nd Cir. 1975) ("Complete readability of the claim on the thing offered is not required.")

■ The fact that the transaction between Lucas and Eimco related to a machine which eventually evolved into the invention is not dispositive of the "on sale" issue, however. As the Court stated in *Hobbs v. United States, Atomic Energy Commission*, 451 F.2d 849, 859 (5th Cir. 1971):

4. This does not mean that the absence of an element of the invention from a sale pursuant to an agreement between the vendor and vendee for joint development would not bar the application of § 102(b). All the Court holds, at this point, is that the mere fact that the vendee furnished an article which constitutes an element of the invention will not, absent other facts, preclude application of the statutory bar.

5. Indeed, the defendants have placed themselves in the rather curious position of arguing

with respect to the late claiming issue that the gist of the invention is not that it describes a method for changing tools directly or indirectly [i. e. by using the magazine (direct) or a transfer arm (indirect) as the tool changer] but rather that it describes a method for changing keyed tools by use of spindle orientation, while at the same time arguing that the absence of a magazine, clearly not a part of the gist of the invention according to their formulation, precludes application of the on sale bar.

The mere existence of a sales contract is insufficient to establish a placing "on sale." The invention that is the subject of the sale must be a reality in the sense that it must be beyond the experimental stage.

Most courts considering the issue have held that in order for an invention to be on sale within the meaning of § 102(b) the transaction must concern an invention which has been reduced to practice. See e. g. *Timely Products Corporation v. Aaron, supra; In Re Yarn Processing Patent Validity Litigation*, 498 F.2d 271 (5th Cir. 1974); cert. denied 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Dart Industries, Inc. v. E. I. Dupont de Nemours and Co.*, 489 F.2d 1359 (7th Cir. 1973). Unfortunately, the Court of Appeals for the Sixth Circuit has not passed on this issue. In *Ajem Laboratories, Inc. v. C. M. Ladd Co.*, 424 F.2d 1124 (6th Cir. 1970) cert. denied 400 U.S. 830, 91 S.Ct. 59, 27 L.Ed.2d 60 (1970), the Court assumed without holding that a reduction to practice was necessary for an invention to be "on sale." In view of this decision and the numerous cases holding that a reduction to practice is essential to the statutory defense, the Court is of the opinion that the plaintiff bears the burden of showing a reduction to practice before the critical date in order to prevail on its claim that the invention was "on sale" within the meaning of § 102(b).[6]

The question presented, then, is whether the invention was reduced to practice prior to April 27, 1959. The plaintiff relies on the February 17, 1959 demonstration described above, as a reduction to practice. There is no dispute, however, that the machine tested on February 17, 1959, did not have certain features which were later incorporated into the machine delivered to Eimco.[7] Specifically, the machine tested had only two-axis numerical control and thus lacked a device capable of automatical-

ly moving the various components of the machine in three axes. More importantly, the machine lacked means for automatically stopping the spindle in one predetermined angular position.

The question whether the absence of these elements precludes a finding that the machine was reduced to practice on the date alleged by the plaintiff requires an analysis of the law relating to reduction to practice as well as an analysis of the roles these features played in the invention.

In *Ajem Laboratories, supra*, the Court, in discussing the concept of reduction to practice in the context of the on sale defense, stated:

This court has previously held (in a case dealing with Section 102(g)) that for patent purposes an invention may be reduced to practice by building a working model and operating it under simulated field conditions without the necessity of showing successful commercial use:

"Satisfactory reduction to practice of an invention does not, however, demand proof of successful commercial use. It does demand tests which successfully prove practical utility for its intended use. The Court of Customs and Patent Appeals has outlined these principles thus:

To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, the machine must be tested under actual working conditions in such a way as to demonstrate its practical utility for its intended purpose. Patents, 1219. Actual performance is required of the

---

**6.** Although not dispositive of the issue, it is important to note that the plaintiff has never taken the position that any lesser showing is required.

**7.** The defendants argue that since the machine tested was not the actual machine that Eimco

received, the invention could not have been on sale. This argument is unpersuasive. So long as some form of the invention was reduced to practice, it makes no difference that the physical piece of equipment received by Eimco differed from the machine demonstrated.

function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful.

*Id.* at 1127–28.[8]

Other courts have rendered similar pronouncements in the process of considering a contention that an invention was "on sale." For example, in *Timely Products Corporation v. Aaron*, 523 F.2d 288, 302 (2nd Cir. 1975), the Court held that among other things a party asserting the "on sale" bar must show that:

The invention [has been] tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice.

And in *In Re Yarn Processing Patent Validity Litigation, supra*, the Court posited a four phase model of the invention-patent process to facilitate its analysis of the concept of reduction to practice. The model used by the Court is as follows:

The earliest phase in the development of any invention is its mental conceptualization by the inventor, the time when the idea first dawns. This is typically followed in short order by the second phase, in which the inventor attempts to embody his idea in a working model or prototype. Phase two ends when he has succeeded in rendering his idea a reality by constructing a working model that substantially embodies the claims later to be patented. Then begins the third phase, in which the inventor experiments with his model so as to satisfy himself that it needs no further

refinement and to prove its fitness for the intended purpose. Once this is completed, the inventor is free to initiate the last phase of concern to us, in which he secures a limited legal monopoly to himself under the patent laws. This last phase is initiated by his application for the patent and terminates when the patent is finally issued. This is the general factual context of the legal issues before us. *Id* at 275.

With respect to the legal definition of reduction to practice, the Court stated:

Thus the legal definition of the date of reduction to practice appears to equate it precisely with the end of the experimental period for purposes of § 102(b). At least one commentator has clearly equated the two.

[T]he law on experimental use has developed mainly from the diverse jurisdictions in infringement cases and has had less than homogeneous treatment. It is safe to say, therefore, that not all courts will recognize that the determination that a public use is excused as experimental depends upon a finding that there has not been at that point an actual reduction to practice of the claimed invention. Nonetheless, no other reasonable basis for the determination exists in the light of the patent statute.

Kayton, *This Year* (1966). In *Patent Law*, 35 Geo.Wash.L.Rev. 720, 727 (1967). The purpose of the experimental exception to § 102(b) is to allow the inventor sufficient time to perfect his invention. An invention is "perfected" for purposes of patentability once it has been reduced to practice by sufficient testing and experimentation to demonstrate its utility.

---

8. It is important to note that the Sixth Circuit has applied a similar standard in the analogous situation where a patent is asserted to be invalid as a result of a public use prior to the critical date. In *Reo Motor Car Co. v. Gear Grinding Machine Co.*, 42 F.2d 965, 968 (6th Cir. 1930), the Court stated:

We see no principle, in the precedents or in the policy of the statute which would require a valuable invention to be lost by permitting the bar to begin to run while the invention,

whether of machine or process, is being gradually improved and developed up to the point of ascertaining whether it has real utility. Nor can it rightly be said that a public use of the developing and incomplete invention—incomplete as finally claimed—can nevertheless operate as a public use bar because adding the final element of perfection did not involve invention as compared with the earlier form to which it was added.

At that point, then, further experimentation is not necessary before applying for a patent, and it would seem that the experimental period should end. *Id.* at 280–81 (Citations omitted).

On the basis of these decisions, the Court is of the opinion that the invention was not reduced to practice before the critical date and that the "on sale" bar does not apply. Although the three-axis numerical system control is not specified in the invention, the claims of the invention clearly read on a machine with automatic tool changing capability. Automatic tool changing in the machine ordered by Eimco and the machine shown as the preferred embodiment of the invention would be impossible without three-axis control to align the spindlehead and magazine and thereafter, to cause insertion and withdrawal of tools from the magazine. However, even if the three-axis numerical control system were present at the February 17, 1959 demonstration, the absence of a means for automatic spindle orientation is clearly fatal to the plaintiff's contention that the invention was reduced to practice on that date. The absence of such means required that the spindle in the machine demonstrated be moved by jogging it with a pendant control device. In other words, the system was not fully automatic because an operator was required to operate the pendant control. As a result, it is clear that Seager's requirement for a fully automatic machine like that described in the patent in suit was not met.

Some courts have recognized that a reduction to practice can occur even though minor or insignificant refinements must be made. See e. g. *Kraus v. Emhart Corp.*, 320 F.Supp. 60 (N.D.Cal.1970). Such decisions have no applicability to this case. The addition of means to stop the spindle in a predetermined angular position was neither minor nor insignificant. It is clear from the record in this case that spindle orientation is necessary to automatically change keyed tools in such a way that a tool will retain the same predetermined angular position relative to the spindle each time it is inserted in the spindle. It is equally apparent that the spindle orientation feature is one of the most important differences between the invention claimed by the patent in suit and the prior art presented in this case. As noted previously, until the invention of Stephan et al. machines had been patented which changed tools automatically in such a way that the angular position of the tool in the spindlehead was repeated within a few degrees for each use of the tool. Such machines were incapable of changing keyed tools, however. Similarly, machines had been produced which were capable of changing keyed tools automatically. However, these machines were such that angular orientation of the tool and spindlehead was not assured.

In this regard, it is also important to note that one of the major thrusts of Seager's concept was not only to have a machine which changed tools automatically, but also to have a machine which could use keyed tools. Thus, the fact that the continuation application of Stephan et al. states that the invention was not limited to changing keyed tools, does not detract from the fact that the desire to automatically change keyed tools was a principal factor in the inventors' minds and an important feature of the invention.

Based upon the record, then, it is impossible for the Court to conclude that the February 17, 1959 demonstration constituted a reduction to practice. Absent a means for spindle orientation, it can hardly be said that the invention was essentially complete at the time of the invalidating sale or at any time before the critical date. See *Dart Industries, supra* at 1365. Nor can it be said that the machine was completed in an operative form capable of demonstrating its practical utility in its intended field of use, see *Ajem Laboratories, supra* at 1127, or that the invention was in such a state on February 17, 1959, that further experimentation was not necessary before applying for a patent. See *In Re Yarn Processing, supra* at 281.

In spite of this, the plaintiff contends that the Court should hold that the February 17, 1959 demonstration constituted a

reduction to practice because spindle stoppage was old in the art and only routine skill was required to build the patented invention. To be sure, both Seager and Meinke expressed their satisfaction that the invention *could* be built following the February demonstration. This argument, however, overlooks the fact that the fully automatic nature of the machine was not demonstrated on February 17 and that discussions regarding stopping the spindle continued after the critical date. In fact, spindle stoppage was not even achieved to Seager's satisfaction when the machine was demonstrated in October, 1959.

Furthermore, Seager's deposition testimony clearly shows that following the February 17, 1959 demonstration he was still uncertain of the success of the venture and that, as a result, he was still concerned with having a conventional Lucas machine to fall back on if the project failed:

Q. Now, do you know approximately when this demonstration [the February 17, 1959 demonstration] or test was conducted?

A. I think it would be early in the year of '59.

Q. And then following that demonstration what was the next highlight?

A. Well, I think then we formalized an order, which we have already gone through, in which we left some things out. In other words, we made a lot of assumptions—we think we can do this, but we are not sure. So Eimco took the position, okay, we have got to buy a boring mill—no. We have got to buy two boring mills. But we don't know whether we are going to get what we are looking for. Therefore, we will get the machines on the basis that if we fail we still have a boring mill—it's the same as if we bought a standard boring mill except it would be a little more sophisticated. At that we wouldn't have had a tape control unit on it at that point. We would have a pen-

dant control. So we could have used it just as a standard boring mill.
Plaintiff's Exhibit 284 at 133.

Seager's testimony also makes it clear that the spindle orientation problem was not as easily solved as the plaintiff contends:

Q. What was the position of Lucas at this time? Were they saying we could do it?

A. Lucas was saying we can do it, yes. Mr. Stephan said, "I know I can stop the spindle." And without going into a lot of detail, he made a number of attempts at various things before he came up with a final answer.

Q. Was he present at this demonstration also?

A. Yes.

Q. And was he satisfied with it at the end of the demonstration?

A. Well, except he couldn't stop the spindle, and I wasn't satisfied with it either. I mean, this was part of the development program.
Plaintiff's Exhibit 284 at 133–34.

Thus, Seager still recognized the possibility that the project might fail and, accordingly, viewed Eimco's agreement to design and procure the magazine and holding fixtures as a financial risk:

. . . Now, had we failed on this thing, we would have then had fifteen or twenty thousand dollars worth of tools, all the tools, which would have been okay. But the magazine and the holding fixtures probably would have been a waste of money. So we stood to possibly throw eight or nine thousand dollars down the drain. So this was a calculated risk that management was willing to take, because we needed the machine anyway.
Plaintiff's Exhibit 284 at 134–35.

Based on this testimony, the Court concludes that the plaintiff's claim that further development of the machine demonstrated on February 17 involved only routine skill is unpersuasive and that the invention as described in the patent was not sufficiently reduced to practice on that date to assure

its success and obviate the need for further experiment before the filing of a patent application.

In addition, whether the means for stopping the spindle involved routine work or invention, it is apparent that spindle stoppage was an essential part of the invention and was not present in a prototype or model of the machine until September, 1959. In short, since the invention in this case concerns a machining center which has the capability of changing keyed tools automatically, the Court does not believe that the demonstration of a machine which had few of the capabilities of the invention and which manifestly could not change tools automatically constitutes a reduction to practice of the invention. Cf. *Fredkin v. Irasek*, 397 F.2d 342, 55 C.C.P.A. 1302, 158 U.S.P.Q. 280 (C.C.P.A.1968).

A similar situation existed in *Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corporation*, 316 F.2d 459 (9th Cir. 1963), where the appellant contended that an invention had been placed on sale prior to the critical date. The patents in suit involved machines for automatically freezing packaged foods. Prior to the critical date, the inventor had done some testing, but was unable to complete his testing because freezer plates which he had ordered had not been delivered. With respect to these plates, the Court stated:

> Knowles [the inventor] testified that he knew the plates would work because they had been in use for years. But, until the plates were completely installed and the machine set up, it was not possible to test, by mechanical means, whether the plates would stop at the right location, engage the dogs properly, and move all the way up and down. *Id.* at 461, n.5.

The Court went on to hold that the failure to have the invention constructed at the time of the alleged sale was fatal to the "on sale" defense.

Like the inventor in *Amerio*, the inventors, in this case, although believing they would succeed, could not have constructed or sufficiently tested their invention prior to the critical date to prove that it would perform in the way expected. Consequently, the Court is of the opinion that the invention was not reduced to practice on or before April 27, 1959.

■ Furthermore, the Court is of the opinion that the authority relied on by the plaintiff in support of what is in essence an obviousness argument is inapplicable to the case at bar. The principal case relied on by the plaintiff is *Timely Products Corporation v. Aaron, supra*, where the Court held that one of the requisites for applying the "on sale" bar is that the complete invention claimed must have been embodied in or *obvious* in view of the thing being offered for sale. Other cases have recognized that obviousness plays a role in determining whether a particular device which is sold (or is in public use) constitutes the invention. *Frantz Manufacturing Co. v. Phoenix Manufacturing Co.*, 457 F.2d 314 (7th Cir. 1972); *Tool Research and Engineering Corp. v. Honcor Corp.*, 367 F.2d 449 (9th Cir. 1966), cert. denied 387 U.S. 919 (1967). However, these cases do not stand for the proposition that a reduction to practice may be implied from the fact that the invention is obvious from what has been sold. Indeed, when applied in the "on sale" context the proposition most evident from these cases is that the concept of obviousness can be used to determine whether the subject of the sale was the invention[9] or something else. More specifically, as set forth in these cases, the obviousness criteria appears to apply where the inventor contends that insignificant or minor differences between an invention and the article placed "on sale" or in public use precludes the application of § 102(b). In this case, the Court has already determined that question in favor of the plaintiff, to the extent that it has held that the transaction in this case involved the invention.

---

**9.** As the Court stated in *Tool Research and Engineering, supra*,

In either case the invention should fall within § 102(b) if the differences between the claimed thing and the sold or used thing are obvious to one skilled in the art. *Id.* at 454.

As a result, the Court does not believe that the plaintiff's obviousness argument does away with the requirement that a reduction to practice prior to the critical date be shown in order to make the § 102(b) bar effective. The Court, in *Timely Products*, the case principally relied on by the plaintiff, implicitly recognized this by stating that in addition to the requirement of showing that the invention was embodied in or obvious in view of the article being sold, the party seeking the benefit of the defense must also show that the invention was completed or reduced to practice.[10] Clearly this requires a different showing than that the invention was obvious in view of the article sold. Consequently, the Court is of the opinion that it must look to the cases involving the issue of reduction to practice cited above rather than the cases dealing with obviousness to determine whether the invention was sufficiently completed prior to the critical date for the "on sale" bar to apply. Since the Court has determined that the facts of the case do not show that the February 17, 1959 demonstration constituted a reduction to practice within the legal meaning of that term, the Court is of the opinion that plaintiff's obviousness argument cannot be used to turn that demonstration into an invalidating event.

Despite the facts that the evidence surrounding the development of the invention does not show a reduction to practice on the date alleged by the plaintiff, it is argued nonetheless that the admissions of Stephan et al. before the patent office establish February 17, 1959, as the reduction to practice date. The statement most heav-

ily relied on by the plaintiff is the Rule 131 affidavit submitted by Seager and quoted extensively above. The affidavit recites facts which are not really in dispute but the plaintiff claims that because the affidavit was used to support a claim of reduction to practice on February 17, the defendants should somehow be bound to that date.[11]

The problem with this argument is that the affidavit was submitted to overcome a Patent Office rejection of Claims 17 and 18 of the patent in suit; claims which by their terms do not include means for stopping the spindle in a predetermined angular position. Hence, the affidavit is easily and consistently read as alleging a reduction to practice of only certain parts of the machine described in the patent in suit. As a result, the Court concludes that this affidavit is not dispositive of the reduction to practice issue.[12]

The other statement, on which the plaintiff has placed little reliance in his post-trial filings, is the one quoted above from the interference brief of Stephan et al. which states that had Stephan et al. not overlooked the February 17 demonstration when preparing its preliminary statement that demonstration would have been alleged as a reduction to practice.[13]

The Court is of the opinion that this statement is not dispositive of the reduction to practice issue. First, as the Court held in its Memorandum Opinion regarding the cross motions for summary judgment, the requisites for the application of the doctrine of judicial estoppel are not present in this case. Consequently, the statement must be considered in the same way as any other

10. In addition, the *Timely* court required a showing that the sale was primarily for profit and not for experiment.

11. In its September 28, 1978 Memorandum Opinion concerning the cross motions for summary judgment, the Court held that the requisites for an estoppel with respect to this statement were not fulfilled. Consequently, the statements in the affidavit must be considered in light of the other evidence established in the case.

12. The plaintiff points out that the attorney who prepared the affidavit has stated in his

deposition for this case that the affidavit was intended to show a reduction to practice of the entire invention. This testimony is suspect, however, because it ignores the fact that the affidavit specifically refers to Claims 17 and 18. In addition, the Court takes note that the testimony is even more suspect because it was given more than five years after the affidavit was executed.

13. Stephan et al. was bound to reduction to practice dates of October 21 and 22, 1959, as set forth in its preliminary statement.

evidence and the defendants are not precluded from arguing or offering evidence showing that February 17 was not the reduction to practice date. Second, as noted above, the facts surrounding the demonstration clearly show that the invention was not reduced to practice in the legal sense on February 17. Third, the statement in the brief is isolated and did not represent the official position of Stephan et al. And finally, as set forth more fully in the Court's earlier opinion, Stephan et al. gained nothing by this assertion. Accordingly, the Court holds that neither of these statements is sufficient to disturb its finding that the invention was not reduced to practice prior to the critical date.

■ Even if the invention had been reduced to practice as asserted by the plaintiff, the Court is of the opinion that the circumstances surrounding the invention mandate a holding that the transaction between Lucas and Eimco was not a sale within the meaning of § 102(b). Specifically, the Court finds that the invention was jointly developed by Seager of Eimco and Stephan of Lucas and, thus, was not on sale from Lucas to Eimco.[14]

One factor leading to this conclusion is that while the evidence clearly shows that the machine was built primarily by Lucas, it is also clear that Eimco undertook to design the magazine and have it built by a subcontractor. Even apart from the design of the magazine by Eimco, the record supports a finding of joint development. The evidence clearly shows that Seager of Eimco was involved in the invention from the outset. Indeed, it appears that many of the decisions regarding the machine resulted from discussions between Seager, Stephan and Meinke. To be sure, Lucas was saddled with the primary burden with respect to the invention. This, however, does not detract from the inescapable conclusion that Seager, as a representative of Eimco, was involved in the conception of the invention.

The facts surrounding the filing of the patent application and the eventual assignment of sole ownership of the patent is even more compelling evidence in support of the Court's conclusion that the invention was the subject of a joint development rather than a sale. It appears from the record that Lucas was interested in obtaining a patent on the machine developed by Seager and Stephan. As a result, it negotiated with Eimco through its patent counsel and came to an agreement whereby Eimco would not exercise its right to an assignment of Seager's patent rights and Seager would in turn assign those rights to the New Britain Machine Company of which Lucas was a division. In consideration for said assignment, Seager was to receive $500, if and when the patent was granted, and Eimco received a non-exclusive royalty free license to manufacture, use and sell devices embodied in the invention. The license was not transferable without the written consent of New Britain.

The plaintiff contends that this is not evidence of joint development because Seager received a "mere $500" for his patent rights. An examination of the record, however, refutes this argument. First, it is clear from Seager's testimony that he was not expecting to receive anything for his patent rights since he was of the belief that such rights belonged to his employer. Second, $500 was not the total consideration for Seager's rights, since Eimco received certain privileges under the licensing agreement. Third, communications between the respective counsels for Eimco and New Britain negate any inference which might be drawn from the alleged inadequacy of the consideration paid by New Britain. These letters make it clear that one of the reasons that Eimco did not drive a harder bargain was that it was not in the business of producing machines similar to that which is the subject of the patent in suit. Clearly it was not Eimco's position that it was not entitled to greater consideration because Seager's contribution to the invention was

---

14. Although the plaintiff has argued that the facts of the case do not support a conclusion of joint development, it has never disputed, as a matter of law, the defendants' contention that if the invention was jointly developed, the "on sale" bar does not apply.

minimal. This much is clear from the April 25, 1960 letter of Robert R. Finch, Eimco's patent counsel to Stephan which states:

> As you well know, we are not now engaged in any business resembling production of equipment of this nature. However, one can never predict the future with certainty and to protect our position against all eventualities, we request from you a royalty-free non-exclusive license to make use and sell and to sub-license others to make use and sell the invention. To safeguard your interests to the highest degree possible, we are willing to undertake not to issue sub-licenses to make or sell to parties outside of our own corporate structure without first discussing the matter with you.
>
> .        .        .        .        .
>
> There still remains the question of consideration for the transaction; and we wonder whether you have had any thoughts along this line. Admittedly, both companies have invested time and effort in the development. But since we are not in the machine business, you are the only one who stands to profit. We are entirely open on this matter but it would seem advisable to have some type of payment by way of a continuing royalty or modest lump sum to support the transaction and at the same time give us a possible basis for rewarding our Mr. Seager for his contribution.

Plaintiff's Exhibit 65.

In view of these facts, the Court cannot conclude that the transaction between Seager, Eimco and New Britain with respect to ownership of patent rights was a sham. Indeed, it appears to have been a legitimate transaction in which Eimco had real bargaining power and was able to obtain essentially what it wanted from New Britain in exchange for New Britain's gaining sole ownership of the patent. Consequently, the Court considers the evidence surrounding this transaction to be highly probative of a joint development of the invention by Stephan of Lucas and Seager of Eimco.

This evidence when considered in connection with the testimony regarding Seager's participation in the development of the invention summarized above, leads to the inescapable conclusion that the original transaction between Lucas and Eimco, rather than being the sale of a machine invented by Lucas, constituted the sale of a machine jointly developed by both Eimco and Lucas and built primarily by Lucas.[15]

For the reasons stated above, the Court holds that the invention described in the patent in suit was not on sale as claimed by the plaintiff and awards a judgment to the defendants on this issue.

### III. LATE CLAIMING

Having decided that the device described in the patent in suit was not "on sale" as alleged by the plaintiff, the Court must now deal with the plaintiff's contention that Claims 6 through 23 of the patent are invalid for late claiming. The legal principles underlying the plaintiff's allegations of late claiming are concisely set forth in *Cardinal of Adrian, Inc. v. Peerless Wood Products*, 363 F.Supp. 1298, 1309 (E.D.Mich.1973) aff'd 515 F.2d 534 (6th Cir. 1975):

> [T]here are two issues to be determined by the Court as to the defense of late claiming. The first is whether or not the amendments made to each application broadened the patent so that it covered additional inventions, i. e. contained new matter; and second, whether the amend-

---

**15.** In support of their argument concerning joint development, the defendants have relied on an article which appeared in the May 30, 1960 edition of *Steel, The Metalworking Weekly*, wherein it is stated that the invention was the product of a joint development effort by Lucas and Eimco. While the plaintiff had originally offered the article as an admission by the defendants' predecessors, plaintiff's counsel objected to the use of the article as proof of joint development. The Court is of the opinion that the plaintiff's objection is to be sustained. The article when offered to prove joint development is clearly being offered to prove the truth of matters asserted therein. Consequently, the article, as offered by the defendants, is inadmissable hearsay and has not been considered by the Court in reaching its decision. See F.R.E. 801(c).

ment constituted the first disclosure of the device . . . that has been for sale or in the public domain for more than one year prior to the amendment.

The plaintiff's late claiming defense depends upon the distinction between direct and indirect methods of changing tools. For purposes of this opinion, the process by which tools are transferred directly between the magazine or tool storage device without the aid of any separate mechanism will be referred to as direct tool changing while the process whereby these tools are transferred between the spindle and magazine or tool storage device by use of a separate device will be referred to as indirect tool changing.

The plaintiff alleges that the application of Stephan et al., as originally filed, did not disclose a machine utilizing an indirect method of tool changing, but instead disclosed a machine which used only the direct method of tool changing. The plaintiff claims that Stephan et al. later broadened their claims to include indirect methods of tool changing more than one year after machines incorporating indirect tool changing with spindle orientation had been on sale or in public use.

The parties have now called upon the Court to determine whether Stephan et al. did in fact broaden their claims and, if so, whether such broadening was impermissible. Turning to the first prong of the *Cardinal of Adrian* test, it is undisputed that the defendants are now asserting that certain claims of their patent are infringed by a machining center which changes tools indirectly and it is to this extent that the plaintiff contends that the claims of the patent are invalid. See *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677 (7th Cir. 1977), cert. denied, 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). Therefore, the first issue for the Court to determine is whether the application as originally filed disclosed a machine having indirect tool changing capabilities.

█ At the outset, the Court rejects the plaintiff's contention that this issue has already been decided adversely to the defend-

ants by the Board of Patent Interferences. In order to deal more fully with this contention, it is necessary to examine the facts surrounding the interference in question. On March 20, 1964, the Patent Office declared an interference between Stephan et al. and two other parties, one of which was Sedgwick et al. The patent claim in issue corresponded with amended Claim 6 of the Stephan et al. application as it stood at that time. Thus, the count in interference read:

A machine tool comprising a tool spindle; magazine means for supporting discrete tool devices of a plurality of tool devices in a predetermined angular position; means for sequentially transferring selected devices of said plurality of tool devices in said magazine means to said tool spindle; means for rotating said tool spindle and a selected tool device transferred thereto; means for stopping said tool spindle in the same predetermined angular position upon discontinuation of its rotation; and means for returning the tool devices in said tool spindle to said magazine means in said predetermined angular position in which said tool device was previously supported therein. Plaintiff's Exhibit 280A.

After the other party was dismissed from the interference, Sedgwick et al. moved to have Stephan et al. dismissed on the basis that their disclosure failed to support the count. Although this motion was originally denied, the Board eventually dismissed Stephan et al. on the basis that the count required a separate transfer device and that no such device was set forth in the disclosure of Stephan et al.

Despite plaintiff's protestations to the contrary, it is clear that this decision was not tantamount to a holding that none of the claims of the original application were generic with respect to tool changing. As the defendants' expert Vincent Barker pointed out, the count in issue was one which read only on a machine having spindle orientation and a separate transfer device. Thus, Stephan et al. clearly was not entitled to that count since they did not disclose that species of the invention in

their original application. The holding clearly is not a statement that Stephan et al. did not have claims which were generic with respect to tool changing. Nor was it a holding that Stephan et al. was not entitled to such a generic claim. In effect, all the holding meant was that Stephan et al. could not on the basis of their original disclosure support a claim which read solely on a machine employing a separate means for tool changing.

■ Consequently, the Court must conduct an independent examination of the original application to determine whether it is limited to direct methods of tool changing. Such an examination reveals that the application as originally filed did not disclose or claim indirect methods of transfer using spindle orientation.

First, it is clear to the Court that the specifications and drawings of the application as originally filed do not disclose or lay claim to "tool changing" in a generic manner. The defendants rely on only a few passages in the specifications as not being limited to direct methods of tool changing. It is clear, however, that when read in the context of the entire specifications that these passages were not intended to broaden the coverage of the specifications beyond the direct method of tool changing specifically disclosed.

The only suggestion that the inventors were attempting to gain greater coverage for their patent derives from the following remarks in the application:

> While the preferred embodiment of the invention has been described in considerable detail it will be apparent to those skilled in the art to which it relates that the invention is not limited to a particular type of machine or to the type of machine shown having the particular construction described, and that the invention can be otherwise embodied, for example, the invention is equally applicable to vertically typed boring machines and various types of automatic programming equipment other than punched tapes, such as magnetic tapes.

It is also to be understood that the invention contemplates means other than that shown for yieldably supporting the tool holding devices or magazine and shutting down or stopping the machine and more particularly the relative movements between the tool carrier or spindle and the tool magazine in the event of improper contact occurring there between.

It is our intention to hereby cover all adaptations, modifications and uses of the invention which come within the practice of those skilled in the art to which it relates and the scope of the appended claims.

Despite this broad language concerning other embodiments of the invention and the listing of some alternatives, the Court is of the opinion that such general language cannot be taken as any indication that Stephan et al. was attempting to assert coverage over machines having indirect transfer mechanisms.

Even if the specifications and drawings along with the above quoted comments can reasonably be taken as claiming tool changing in the generic sense, they cannot be used to support the defendants' position unless claims of similar breadth appear in the application. *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1965). Consequently, the Court must look to the claims of the application to determine whether the inventors' original claims dealt with tool changing in a generic manner or were limited to indirect tool changing.

The application of Stephan et al. originally filed on April 27, 1960 contained four claims. The defendants have admitted that Claims 2, 3 and 4 of this application are limited to a machine which changes tools between the spindle and magazine directly. As a result, the Court must consider whether Claim 1, as originally filed, was limited to one method of tool changing or whether it covered both indirect or direct methods of tool changing. Originally filed Claim 1 reads as follows:

> In a machine tool a tool carrier having tool attaching means operable by power

to grab or release a tool, means for selectively rotating said tool carrier, means for stopping said tool carrier in the same predetermined annular position upon discontinuation of its rotation a plurality of tool holding means, means supporting said tool carrier and tool holding means for relative movement both transversely and axially of the axis of rotation of said tool carrier, means for effecting relative movement between said tool carrier and said tool holding means transversely of the axis of rotation of said tool carrier to selectively align said tool carrier and one of said tool holding means, means for effecting relative movement between said tool carrier and said tool holding means lengthwise of the axis of rotation of said tool carrier while said tool carrier is aligned with a selected one of said tool holding means to position said tool carrier adjacent to said tool holding means, and means for actuating said tool attaching means of said tool carrier while adjacent to said tool holding means.

The plaintiff contends that Claim 1 cannot be given a broad reading which is unsupported by the specifications, and must therefore be read as being directed toward indirect tool changing only. While the Court agrees that the specification contained in the original application when read as a whole does not disclose an indirect machining center as an alternative embodiment of the invention, the Court is of the opinion that this is not fatal to the defendants' contention that Claim 1 is a generic tool changing claim. In *In Re Vickers*, 141 F.2d 522, 31 C.C.P.A. 985 (1944), the Court set forth the general principle that absent other factors an inventor is not confined to claims which read on the preferred embodiment of his invention and that broad mechanical claims can be supported by the disclosure of a single form of the apparatus. See also *Application of Smythe*, 480 F.2d 1376 (Cust. & Pat.App.1973). Therefore, the fact that Stephan et al. failed to disclose alternative embodiments of their invention does not mean that they are not entitled to a broad claim reading on such embodiments, providing that such a claim is permitted by the prior art.

Despite the fact that Stephan et al. may have been entitled to make broad generic claims with respect to methods of tool changing, the Court is of the opinion that Claim 1 is not such a claim. While the language of this claim is arguably broader than that of Claims 2, 3 and 4 of the original application since it does not limit the placement of the tool holding means to the work table, (a construction which requires that tools be changed directly) the Court is of the opinion that this claim is not sufficiently generic to read on indirect tool changing. Clearly the movements described in Claim 1 are the machining motions of different parts of the machining center required to change tools in such a way that the tool holding devices are aligned with the spindle and tools are either inserted in or withdrawn from the spindle. Such movements clearly do not describe the use of a separate tool transfer device.

Further evidence of the limited nature of Claim 1 is provided by the testimony of the defendants' expert, Barker, who attempted to read Claim 1 on a machine employing a separate transfer arm and described in a patent issued to Robert K. Sedgwick, et al. The Sedgwick patent describes a machine tool similar in many respects to the machine described in the patent in suit. The major difference between the two is the transfer mechanism employed. The machining center described in the preferred embodiment of the patent in suit utilizes the various machining motions of a three-axis numerically controlled machine to transfer tools directly between the spindle and a magazine or tool storage device mounted and fixed to the work table.

The Sedgwick patent, on the other hand, describes a machine wherein the magazine or tool storage device is not affixed to the work table but is separately supported at a position which is to the side of the spindle. In addition, the magazine or tool storage device described in the Sedgwick patent is a rotatable drum which can be moved to any selected position in order to present the proper tool to be inserted into the spindle.

The Sedgwick machine is also equipped with a separate tool changer which is a rotatable arm with devices for gripping tools at either end. The machine described in the Sedgwick patent changes tools first by rotating the magazine so that the proper tool is placed in position for changing. The spindle is then stopped in a predetermined angular position and moved by means of numerical control to its tool changing position. The gripping mechanisms on either end of the tool changer, which is interposed between the magazine and the spindle, grip the tool in the spindle and the tool in the magazine simultaneously. The tools are extracted from the magazine and the spindle respectively by axial movement of the tool change arm. The tool change arm is then rotated 180° so that the tool which was in the magazine is aligned with the spindle and the tool which was in the spindle is aligned with a vacant compartment in the magazine. The tool changer is then moved axially to insert the tools in the spindle and magazine respectively. The gripping mechanisms are then deactivated and the machine can perform the desired work.

Although it is true that Claim 1 reads on many of the elements and motions described above, the attempt of the defendants' expert to read all of Claim 1 on the machine disclosed by Sedgwick fails in at least two respects. First, in order to read Claim 1 on the disclosure of Sedgwick et al. the defendants' expert stated that the "plurality tool holding means" in Claim 1 when read on the Sedgwick machine included not only the compartments in the magazine or tool storage device but also the gripping mechanisms on either end of the tool change arm. In addition, defendants' expert stated that the term "means supporting said tool holding means for relative movement . . . transversely . . . of the axis of rotation of said tool carrier [the spindle]" when read on the Sedgwick machine included the means for rotational movement of the compartments in the magazine and the gripping devices on the ends of the tool changer arm. The witness did this by breaking the rotational movement of these two devices into two linear motions, one horizontal, and one vertical.

The Court is of the opinion that the reading of Claim 1 by the defendants' expert is so strained that it cannot be accepted even when given a liberal interpretation. First, to state that the term "a plurality of tool holding means" includes both the tool holding devices contained in the Sedgwick magazine and the tool gripping mechanisms on the ends of the tool changer arm clearly stretches the claim beyond its intended meaning. There is absolutely nothing in the remainder of the original application to suggest that when using the term Stephan et al. was seeking coverage over a machine which housed tool holding in any structure other than the magazine. Second, when the term "tool holding means" is employed in the fashion suggested by defendants' expert, it is not consistent with the rest of the claim. Claim 1 requires that the movements described be such as ". . . to selectively align said tool carrier and one of said tool holding means." This language clearly implies that the spindle can be aligned with any one of the plurality of tool holding devices contained in the machine. However, if one reads Claim 1 on the Sedgwick patent in the way advanced by the defendants, it is clear that the only tool holding devices which can be selectively aligned with the spindle are the tool gripping mechanisms on either end of the tool change arm. Consequently, the Court is of the opinion that the term "a plurality of tool holding means" refers to the compartments in a magazine or other tool storage device only and not to a separate tool changing arm. It is clear from the strained interpretation required to read Claim 1 on the Sedgwick machine that if Stephan et al. had meant for Claim 1 to be interpreted otherwise, they could have so stated in a much more succinct and clear fashion. Furthermore, the dissection of rotational motion into its linear components by the defendants' expert clearly stretched the claim beyond its intended scope.

As further evidence of the suspect nature of the reading given originally filed Claim 1 by the defendants' expert, the Court notes

that Mr. Barker stated that he was in agreement with the plaintiff's expert that Claim 1 as originally filed is substantially the same as Claim 1 of the patent in suit. However, an examination of Claim 1 of the patent in suit reveals that the term "a magazine means having a plurality of compartments each adapted for holding a tool device" appears to have been substituted for the term "a plurality of tool holding means" which appeared in the originally filed Claim 1. As a result, the means language required by Claim 1 of the patent in suit for tool changing is as follows:

> . . . means supporting said tool spindle and said magazine means for relative movement both transversely and axially of the axis of rotation of said tool spindle, means for effecting relative movement between said tool spindle and said magazine means transversely of the axis of rotation of said tool spindle to selectively align said tool spindle and one of said compartments in said magazine means, means for effecting relative movement between said tool spindle and said magazine means lengthwise of the axis of rotation of said tool spindle while said tool spindle is aligned with a selected one of said compartments in said magazine means to position said tool spindle adjacent to said selected compartment, and means for actuating said tool attaching means of said tool spindle while adjacent to said selected compartment in said magazine means.

From this language it is clear to the Court that Claim 1 of the patent in suit clearly reads on nothing other than a machine having direct spindle to magazine interchange of tools. In fact, the shift from the "a plurality of tool holding means" described in originally filed Claim 1 to "magazine means" in Claim 1 of the patent in suit renders this later claim even more specific with respect to direct tool changing.[16]

Thus, Mr. Barker's statement that originally filed Claim 1 is essentially the same as Claim 1 of the patent in suit is clearly fatal to his contention that the former is a generic claim capable of being read on a machine employing an indirect transfer device.

Thus, while a generic reading of Claim 1 may be possible in a literal sense, the Court is of the opinion that this was not the type of reading intended by Stephan et al. at the time of the original filing. Consequently, the Court rejects the defendants' contention that Claim 1 when properly construed is generic with respect to tool changing.

The Court's finding that the originally filed application of Stephan et al. does not specifically disclose indirect tool changing or tool changing of a generic nature is not dispositive of the issue of whether the defendants' later assertion of such coverage constitutes late claiming. The basis of the plaintiff's case is that the defendants' claim broadening consists of their assertion that machines employing separate transfer devices infringe certain claims of their patent which are arguably broad enough to read on indirect tool changing. It is not the plaintiff's contention that any of these claims have in fact been broadened to the extent that they read on indirect tool changing or that they are invalid when read on the defendants' preferred embodiment disclosed in the patent.

Consequently, in determining whether the defendants' assertion of infringement constitutes a broadening of their claims the Court must examine the record to determine whether there is a basis in the application as originally filed for the assertion that a machine otherwise meeting the claims of the defendants' patent would infringe said patent despite the fact that the alleged infringer employed indirect transfer means. In other words, if there is a basis in the originally filed application for the defendants' assertion of infringement such assertion cannot constitute late claiming.

---

**16.** In this regard it is important to note that in discussing Claims 13 and 14 (added on May 14, 1969 and predecessors of Claims 8 and 9 of the patent in suit) Stephan et al. stated that a similar shift in language from "support means" in Claim 13 to "magazine" in Claim 14 rendered Claim 14 specific to a machine using direct transfer means, despite the fact that Claim 13, upon which Claim 14 depended, was designed to read on both direct and indirect tool changing. Plaintiff's Exhibit 98 at 101.

Since the Court has held that the claims of the originally filed application when correctly construed do not cover indirect tool changing, the only basis for the defendants' assertion of infringement must be found in the doctrine of equivalents. Thus, if direct and indirect tool changing are equivalents, it cannot constitute late claiming for the defendants to assert their allegedly late filed claims on a machine employing an indirect transfer mechanism since by the use of equivalency they would have been entitled to make such an assertion on the basis of their originally filed claims.

This holding finds support in the well known doctrine that the claims of a patent cover not only the device described but also the equivalents of that device. See 7 Walker on Patents, § 546 (Deller's ed. 1972); 35 U.S.C. § 112. Thus, an allegation that claims were broadened cannot find any support in an alleged broadening which covers nothing more than the equivalent of the original disclosure. Such broadening would clearly not constitute the first disclosure of an "additional invention." See *Cardinal of Adrian, supra.* As the Court stated in *Autogiro Company of America v. United States*, 384 F.2d 391, 410, 181 Ct.Cl. 55 (1967), there can be no late claiming "[w]here the late-filed claim only makes express what would have been regarded as the equivalent of earlier claims." See also *Price v. Lake Sales Supply R. M. Inc.*, 510 F.2d 388 (10th Cir. 1974). Consistent with this approach, at least one court has held that equivalency can be used to defeat a defense of late claiming. *Fujitsu Ltd. v. Sprague Electric Co.*, 264 F.Supp. 930 (S.D. N.Y.1967). Similarly, other decisions have applied the doctrine in the somewhat analogous context of overclaiming. *Ansul Co. v. Uniroyal Inc.*, 301 F.Supp. 273 (S.D.N.Y. 1969); aff'd in part and rev'd in part, 448 F.2d 872 (2nd Cir. 1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).

Thus, in order to resolve the late claiming issue the Court must determine whether indirect and direct tool changing are equivalent within the context of the patent in suit. It is important to note, however, that in accomplishing this task the Court is not deciding whether or not any of the machines produced by the plaintiff infringe the defendants' patent but is merely deciding whether the defendants' assertion of infringement constitutes late claiming.

The doctrine of equivalents applies where a would be infringer copies the ideas and principles behind an invention and makes some insubstantial substitution for an element of one of the patent's claims in order to avoid literal infringement of the patent. *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The purpose of the doctrine is "to give the inventor an opportunity to secure a just reward for his invention—an opportunity which he would otherwise be denied because of the failure of the language of his claim to include devices which were in fact the same as his own in means, function, and result." 7 Walker on Patents, § 546 at 338. (Deller's Ed.1972). Thus, the doctrine gives the inventor the right to enforce his patent against devices which are the equivalent of his own despite the fact that he did not disclose such equivalents in the claims or specifications of his patent. *Id.* at 334. However, the doctrine cannot be used to stretch the scope of a patent beyond all bounds. In order for the doctrine to apply, the alleged equivalent device must perform substantially the same function in substantially the same way to obtain the same result. *Graver Mfg. Co. v. Linde Co., supra.*

As the Court stated in *Graver Mfg. Co. v. Linde Co., supra*, a finding of equivalence is a determination of fact encompassing a wide variety of considerations:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and,

by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. *Id.* at 609, 70 S.Ct. at 857.

See also *Laitram Corp. v. Deepsouth Packing Co., Inc.,* 443 F.2d 928 (5th Cir., 1971).

■■■■■ The range of equivalents to which an inventor is entitled is commensurate with the scope of his invention. *Maytag Co. v. Murray Corp. of America,* 318 F.2d 79 (6th Cir. 1963). Thus, a patent for a pioneer invention is entitled to a broad range of equivalents, *Acme Highway Products Corp. v. D. S. Brown Co.,* 473 F.2d 849 (6th Cir. 1973), cert. denied, 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57 (1974), while a patent which makes a narrow contribution in a crowded art is entitled to a correspondingly narrow range of equivalents. *Maytag Co. v. Murray Corp. of America, supra.* In addition, it should be noted that the doctrine applies to combination patents, such as the one in the instant case, as it would to any other invention. *FMC Corp. v. The F. E. Myers & Bro. Co.,* 384 F.2d 4 (6th Cir. 1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968).

■■■■■ Before proceeding to its decision on this issue, the Court must determine who bears the burden with respect to equivalency. The plaintiff contends that it is the defendants' affirmative burden to establish equivalency, while the defendant maintains that the plaintiff bears the burden of establishing a lack of equivalency. Neither of the parties have cited any authority in support of their respective positions and the Court has been unable to locate any cases dealing with this specific issue. However, the Court is of the opinion that the burden is upon the defendant to show that direct and indirect tool changing are equivalents.

Since the plaintiff has carried the burden of showing that the original disclosure of Stephan et al. did not include a specific disclosure of generic transfer means, it is apparent that the defendants, by their present assertion that later filed claims are infringed by a machine employing a separate transfer arm have, at least by interpretation, broadened their claims. Thus, assuming for the moment that these broadened claims were anticipated by the public use or sale of another machine having an indirect transfer means and otherwise meeting the claims of the patent, the only way the defendants could make their assertion of infringement in this case is through the doctrine of equivalency. Thus, the real issue is the right of the defendants to make this assertion. Since it is the defendants who are relying on the doctrine of equivalency to save what would otherwise be an improper assertion of infringement, it is they who bear the burden of showing equivalency.

Viewed in another way, since the primary issue with respect to late claiming is the defendants' right to make certain claims of infringement and since the party alleging infringement bears the burden of showing equivalency, it is only logical that in a case such as this, the party attempting to justify its assertion of infringement should bear the burden of proving equivalency.

■■■■ The first issue which the Court must determine is the range of equivalents to which the patent or invention is entitled. The defendants contend that the invention is of a pioneer character and is therefore entitled to a wide range of equivalents. In support of this proposition, the defendants rely on two types of evidence. The first type of evidence consists of a set of mainly post-invention patents which show that in the years immediately subsequent to the invention many different ways of automatically changing keyed tools were developed and patented. The second type of evidence came in the form of testimony from one of the defendants' employees to the effect that nearly all of the machines exhibited at the 1976 International Machine Tool Show which used positively driven tools practiced

the teachings of the patent in suit by stopping the spindle in a predetermined angular position preparatory to a tool change. From this evidence the defendants draw the conclusion that the machining center industry was facing a difficult problem regarding the changing of positively driven tools and that a satisfactory solution was not arrived at until the development of the machine described in the patent in suit. The plaintiff has objected to this evidence on the basis of relevancy.

The Court is of the opinion that the evidence, although admissible as being some evidence of the scope of the invention, does not support the proposition for which it is advanced. Clearly, if the industry was facing the grave problem claimed by the defendants, there would have been some live testimony to that effect. Similarly, the fact that many companies now produce machines which change positively driven tools by stopping the spindle in a predetermined angular position, while being some evidence of the commercial success of the invention, may also be attributable to the increasing popularity of certain types of tools in the industry. Consequently, the Court is of the opinion that the invention in this case is not entitled to the range of equivalents which would be accorded a pioneer invention.

Despite this, the Court is of the opinion that the plaintiff's position that the invention is entitled to an exceedingly narrow range of equivalents is not supported by the record. While it is clear that the machining center industry was a crowded art at the time of the original application of Stephan et al., it is also clear that the combination disclosed in the patent was an advance over the prior art in that it included means for stopping the spindle in a predetermined angular position preparatory to an automatic tool change. Thus, while the defendants are not entitled to assert their patent over a broad range of equivalents, the range is not nearly as narrow as the plaintiff contends. Indeed, courts have recognized that without a decent range of equivalents, the advantages secured to the owner of a combination patent would be almost nonexistent:

There is an especial necessity for applying this doctrine to a patent such as the one in suit, which has combined several pre-existing devices in order to arrive at a new and satisfactory solution to the problems of offshore oil and gas exploration and drilling. "Combination patents would generally be valueless in the absence of a right to equivalents, for few combinations now exist, or can hereafter be made, which do not contain at least one element, an efficient substitute for which could readily be suggested by any person skilled in the particular art." Walker, Patents, § 464, p. 1701.

*Samuelson v. Bethlehem Steel Co.*, 323 F.2d 944, 950 (5th Cir. 1963), cert. denied, 370 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

The Court is of the opinion that included within this range of equivalents are machines which otherwise meet the claims of the patent except that they change tools by use of a separate transfer device. There is no question that the two methods of tool changing accomplish the same result. And as the defendants point out, there is a substantial sameness regarding the motions of the tools preparatory to a tool change in that in both instances the tool must be brought into alignment with the spindle by movement in a plane which is transverse of the spindle. In addition, for insertion and withdrawal of tools both methods require relative axial movement between the device which is supporting the tool and the spindle. Furthermore, both methods accomplish spindle orientation by transferring and storing the tool in such a manner that it will always be inserted in the spindle in the same predetermined angular position. Indeed, the fact that defendants' expert was able to read originally filed Claim 1, albeit in a literal manner, on the Sedgwick device, is substantial evidence of equivalency.

Despite these similarities, the Court might be disposed to sustain the plaintiff's position that changing tools directly between the magazine and spindle and using a separate transfer arm are not equivalents and are only the same in the sense that they accomplish the same result, see *Bolkcom v.*

*Carborundum Company*, 523 F.2d 492 (6th Cir. 1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), were it not for the other evidence bearing on equivalency presented in this case. However, such an approach would ignore the Supreme Court's admonition in *Graver Mfg. Co. v. Linde Co., supra*, that equivalence is not a prisoner of formula and is not an absolute to be considered in a vacuum. Upon consideration of the circumstances of the case and the prior art the Court concludes that the very purpose underlying the doctrine of equivalents would be subverted by a decision that the original disclosure in this case did not have indirect tool changing as one of its equivalents.

The first and most important category of evidence pointing toward equivalence is contained in the prior art of record in this case. As the Court pointed out earlier in the opinion, the primary advance over prior art achieved by the inventors in this case was the use of spindle stoppage in the tool change cycle to secure certain advantages with respect to accuracy, especially in the area of changing keyed tools. A second fact which the prior art makes clear is that at the time Stephan et al. filed their application both direct and indirect means of transfer were known and practiced in the art. More importantly, machines using separate transfer arms to change tools were well known at that time. Thus, it is clear to the Court that once Stephan et al. taught the advantages of spindle stoppage in the context of a direct machine one reasonably skilled in the art would have been able to adapt this procedure to machines with indirect transfer arms.

Many courts have recognized that state of the art evidence such as outlined above is a paramount consideration in determining the issue of equivalency. For example, in *Graver Mfg. Co. v. Linde Co., supra*, the Supreme Court stated:

> The question which thus emerges is whether the substitution of the manganese which is not an alkaline earth metal for the magnesium which is, under the circumstances of this case, and in view of

the technology and the prior art, is a change of such substance as to make the doctrine of equivalents inapplicable; or conversely, whether under the circumstances the change was so insubstantial that the trial court's invocation of the doctrine of equivalents was justified.

> Without attempting to be all-inclusive, we note the following evidence in the record: Chemists familiar with the two fluxes testified that manganese and magnesium were similar in many of their reactions. (R. 287, 669). There is testimony by a metallurgist that alkaline earth metals are often found in manganese ores in their natural state and that they serve the same purpose in the fluxes (R. 831–832); and a chemist testified that "in the sense of the patent" manganese could be included as an alkaline earth metal . . . (R. 332). Particularly important, in addition, were the disclosures of the prior art, also contained in the record. The Miller patent, No. 1,754,-566, which preceded the patent in suit, taught the use of manganese silicate in welding fluxes (R. 969, 971). Manganese was similarly disclosed in the Armor patent, No. 1,467,825, which also described a welding composition (R. 1346). And the record contains no evidence of any kind to show that Lincolnweld was developed as the result of independent research or experiments. *Id.* 399 U.S. at 610–11, 70 S.Ct. at 857.

See also, *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 83 (Ct.Cl.1977) ("equivalency is established where a person reasonably skilled in the art would have known of the interchangeability of an ingredient not disclosed in the patent with one that was.")

Similarly, in discussing the concept of equivalence where the alleged infringer substitutes something which is old in the art in order to change what was the inventors' original combination, the Court of Appeals for the Seventh Circuit stated:

> In our opinion, the Supreme Court intended a patentee to be allowed to challenge successfully the use of a substituted ingredient that was known by persons

reasonably skilled in the relevant art as of the date the Patent Office granted the allegedly infringed patent. For example, in *Seymour v. Osborne*, 11 Wall. 516, 555–56, 78 U.S. 516, 555–56, 20 L.Ed. 33 (1871), decided several years prior to Gill, Mr. Justice Clifford, who also authored Gill, speaking for the Court, stated:

"They [holders of patents] cannot suppress subsequent improvements which are substantially different, whether the new improvements consist in a new combination of the same ingredients, or of the substitution of some newly-discovered ingredient, or of some old one, performing some new function not known at the date of the letters patent, as a proper substitute for the ingredient withdrawn from the combination constituting their invention. Mere formal alterations in a combination in letters patent, however, are no defense to the charge of infringement, and the withdrawal of one ingredient from the same and the substitution of another which was well known at the date of the patent as a proper substitute for the one withdrawn, is a mere formal alteration of the combination if the ingredient substituted performs substantially the same function as the one withdrawn."

It appears to us that the Court clearly intended to adopt the theory that he who would deny a charge of infringement on the basis of the newness of the substituted element must have utilized an element that was not known as a proper substitute at the date the patent's claims were staked out in the public domain, i. e., at the date the patent was no longer pending but was granted.

We hold, therefore, that it was erroneous to find non-infringement on the ground that the laser was not in existence in 1957, the date of the Trice application.

To the extent that the district court concluded that the laser beam as a substituted element was insufficiently known at the date Trice was granted his patent, we cannot agree. The record fully supports the determination that in 1964, when the Trice patent was issued, "persons reasonably skilled in the art would have known," *Graver*, supra, 339 U.S. at 609, 70 S.Ct. [854] at 857 [85 USPQ at 330–331], that the laser beam could properly (and profitably) be used instead of the white collimated beam of light.[17]

*Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866, 873 (7th Cir. 1974), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). In addition, other courts have recognized the importance of assessing the state of knowledge in the art in making a determination with respect to equivalence. See e. g., *American Technical Machinery v. Caparotta*, 339 F.2d 557, 560 (2nd Cir. 1964) cert. denied, 382 U.S. 842, 86 S.Ct. 65, 15 L.Ed.2d 83 (1965) ("Not only was defendant's mechanism thought equivalent to plaintiff's, but both had been taught by the prior art") *Cleeton v. Hewlett-Packard Co.*, 343 F.Supp. 1215, 1238 (D.Md.1972), aff'd 475 F.2d 1399 (9th Cir. 1973). ("Mr. Fink's testimony suggests that achieving coincidence between the leading edge of the pulse from the second trigger circuit and the trailing edge of the pulse from the first circuit was well known in the art in and about 1940 and was obvious to one schooled therein. The state of knowledge in the art is an important factor in establishing equivalency.")

■ Based upon these decisions, the Court holds that since indirect tool changing was known in the art and since in the context of the patent in suit it performs in substantially the same way as direct tool changing, the two are equivalents.[18] To be sure, such a holding might not be possible in

17. The Court need not decide the issue presented in *Laser Alignment* with respect to what date one examines the prior art since it is clear that both direct and indirect methods of tool changing were part of the prior art when the patent in suit was filed.

18. This finding of equivalency distinguishes the case at bar from *Bechman v. Wood*, 15 App. D.C. 484 (D.C.Cir. 1899) where the Court found that neither of the inventors of two species of the invention were entitled to broad claims where the species were not equivalent.

another context. For example, if the Sedgwick machine, the device alleged by plaintiff to have anticipated the later filed claims of Stephan et al., were the first machine to employ indirect tool changing, the Court might very well hold that direct and indirect are not equivalents. But when one views the patent in suit in the context of the prior art of which indirect tool changing was a substantial part, it becomes clear that a distinction between direct and indirect tool changing is not warranted with respect to the invention claimed by Stephan et al., the major feature of which is stopping the spindle in a predetermined angular position prior to tool changing.

In so holding, the Court is unable to accept the opinion offered by the plaintiff's expert witness that the "gist" of the Stephan et al. invention was placing the magazine on the table and utilizing the various machining motions to change tools. While it is true that Seager wanted this feature, it is apparent that his desire was motivated by two factors. First, it was inexpensive and second, if Lucas was unable to develop a machine which stopped the spindle accurately Eimco would still have an operable conventional machining center. It is clear, however, that the major thrust of Seager's efforts was to obtain a machining center able to change keyed tools automatically while maintaining the same angular orientation between the tool and spindle for repeated usages. In fact, it was Seager's desire to use a certain type of tooling which discouraged other companies from undertaking the project which was eventually assigned to Lucas. Consequently, while it is clear that the positioning of the magazine was a major factor in Seager's mind from an economic standpoint, it was not necessary or essential to the major feature underlying the invention of Stephan et al.

As a result, to hold that infringement is avoided by the use of an old system of transferring tools in place of an unessential element in the invention of Stephan et al. would deprive the defendants of many of the benefits accruing from the fact that their predecessors were the first to use spindle stoppage in a predetermined angular position to automatically change tools. While the Court recognizes that an unpatented part of a combination is not entitled to monopolistic protection, *Aro Mfg. Co. v. Convertible Top Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), it must be kept in mind that the doctrine of equivalents is an equitable doctrine which attempts to protect the true achievements of the inventor. See generally, 7 Walker on Patents, § 546 (Deller's ed. 1972); *Spee-Flo Mfg. Corp. v. Binks Mfg. Co.*, 264 F.Supp. 542, 545 (S.D. Tex.1967), aff'd 392 F.2d 585 (5th Cir. 1968) (S.D.Tex.1967) ("This doctrine [equivalency] expresses a preference for substance over verbiage recognizing that a device might incorporate the true achievement of the claim in question without literally reading on it.").

In this case, it would hardly be just to permit a person to copy the major advance over the prior art made by Stephan et al. and then incorporate an old and well known method for transferring tools and claim that this newly constructed machine, which within the context of the invention is practically the same, was somehow legally different.

Indeed, this fact is implicitly recognized by the Kearney & Trecker Corporation, the current owner of the Sedgwick patent. Despite the fact that Sedgwick et al. developed a machine which differed from that described in the patent in suit in that it had a separate transfer arm for changing tools Kearney & Trecker pays royalties to Litton under the patent in suit for the right to sell this machine, the Milwaukee-Matic III. This fact has placed the plaintiff in a somewhat curious position. On the one hand it asserts that the rights of Sedgwick et al. intervened before Stephan et al. broadened their claims to cover indirect tool changing. Yet Kearney & Trecker, the owner of those allegedly intervening rights, pays royalties to Litton for the right to sell the very machine which is said to have anticipated the late-filed claims of the patent in suit.

Furthermore, the evidence relied on by the plaintiff as showing a lack of equivalen-

cy is unpersuasive. For example, the plaintiff points out that indirect transfer devices require more sophisticated numerical control systems and operate faster than direct transfer devices. As a result, it might be concluded that while machines employing indirect means are faster, machines employing direct means are less expensive. Such considerations, however, carry little weight in determining the issue of equivalency. As the Court stated in *Lockheed Aircraft Corp. v. United States, supra* :

> Defendant argues against equivalency by pointing out that, in practical operation, the broad band receiver is an effective height finding receiver out to a range of about 70 miles whereas pulse compression allows effective height finding as far out as 180 miles. This is a variance to note, but it is nevertheless universally accepted that infringement is not avoided simply because an accused device constitutes an improvement of the claimed invention. *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.* 363 F.Supp. 1298, 179 USPQ 527 (E.D.Mich.1973); *Amerace Esna Corp. v. Highway Safety Devices, Inc.,* 330 F.Supp. 313, 171 USPQ 186 (N.D.Tex.1971); *Edoco Technical Products, Inc. v. Peter Kiewit Sons' Co.,* 313 F.Supp. 1081, 165 USPQ 207 (C.D.Calif. 1970); and *Eastern Rotocraft Corp. v. United States,* 397 F.2d 978, 184 Ct.Cl. 709, 158 USPQ 294 (1968).

> *Id* at 83.

See also *No-Joint Concrete Pipe Co. v. Hanson,* 344 F.2d 13 (9th Cir. 1968), cert. denied,

382 U.S. 843, 86 S.Ct. 79, 15 L.Ed.2d 83 (1965).

Consequently, the Court holds that the first prong of the *Cardinal of Adrian* test has not been met in that the defendants' assertion of infringement by machines having an indirect transfer mechanism does not amount to claim broadening. As a result, the plaintiff's late claiming defense must fail.

■ Although it is unnecessary to the Court's decision, the Court is of the opinion that the second prong of the *Cardinal of Adrian* test has not been met in this case. The second prong of the *Cardinal of Adrian* test requires that the plaintiff show that the scope of the patent application of Stephan et al. was broadened more than one year after devices anticipating the broadened claims were on sale or in public use. See 35 U.S.C. § 102(b).

The plaintiff relies on a September, 1960 public demonstration of the machine described in the Sedgwick patent, the Milwaukee-Matic III, as anticipating the allegedly broadened claims by more than one year. Even assuming that the plaintiff has established that the September 1960 demonstration was a public use of a machining center which changed tools automatically with a separate change arm by stopping the spindle in a predetermined angular position,[19] the Court is of the opinion that this demonstration did not occur more than one year before Stephan et al. introduced claims which were broad enough to cover tools having an indirect transfer mechanism.

---

19. The Court is of the opinion that this fact has been established by the plaintiff. There was testimony by several employees from Kearney & Trecker, the producer of the Milwaukee-Matic III, to the effect that the machine demonstrated in September 1960 automatically changed keyed tools in essentially the way described in the Court's discussion of the Sedgwick patent. Although the defendants dispute this evidence, the Court finds that the problems raised by the defendants with respect to this demonstration are clearly outweighed by the testimony of the Kearney & Trecker employees. For example, the defendants point out that the location of the keyways in the spindle and the keyways in the tool magazine, as testified to by one of plaintiff's witnesses, were such that keyed tools could not have been automatically changed at that demonstration. The Court finds this evidence to be unpersuasive in light of testimony that a simple adjustment would have corrected this problem. Nor does the fact that photographs of the Milwaukee-Matic III (taken around the time of the demonstration) show a tool which was too large to be changed automatically detract from the testimony of the Kearney & Trecker employees that other tools were changed automatically. Similarly, the defendants' citation of the Interference testimony of a Kearney & Trecker employee to the effect that the machine demonstrated in September 1960 did not operate free of problems is insufficient in the Court's opinion to support a conclusion that the machine demonstrated on September 1960 was not sufficiently complete to activate the public use bar of § 102(b).

On April 26, 1961, Stephan et al. amended their four original claims and added Claims 5 through 8. Claim 6 of the new claims read as follows:

> A machine tool comprising a tool carrier, means for supporting each tool of a plurality of tools in a predetermined annular position; means for individually causing placement of selected tools of said plurality of tools in said tool carrier; means for rotating said tool carrier and said tool placed therein; means for stopping said tool carrier in the same predetermined annular position upon discontinuation of its rotation; and means for returning said selected tools to said support in said predetermined annular position in which said tools were previously supported.

Clearly this claim is broad enough to read on a machine having a separate change arm in that it included "means for individually causing placement of selected tools . . in said tool carrier" and "means for returning said selected tools to said support." Clearly such language could be read on a machine which uses a separate transfer arm to place tools in the spindle and return them to the magazine.[20] Equally clear is the fact that the claim does not contain language similar to that in original Claim 1, quoted above, requiring, in the Court's opinion, a structure similar to a magazine to directly change tools. Furthermore, although the plaintiff's expert testified that in his opinion this claim did not read on indirect tool changing, on cross examination he was unable to support his contention that the claim was limited to direct methods of tool changing. Since this amendment occurred less than one year after the demonstration of the Milwaukee-Matic III relied on by the plaintiff, the second prong of the *Cardinal of Adrian* test has not been met.

▮ Throughout the case the plaintiff has maintained that the late claiming de-

fense is also available under 35 U.S.C. § 102(a) where the "invention was known or used by others in this country . . . before the invention thereof by the applicant for patent." Presumably the plaintiff's contention is that § 102(a) provides a basis for late claiming not premised on the one year statutory bar of § 102(b). The Court is of the opinion that this contention is to be rejected. Section 102(a) has nothing to do with the filing of a patent application or the filing of claims following a prior use or sale of the subject of said claims. All that the section deals with is prior inventorship. While it is true that Stephan et al. did not invent a machine with a separate transfer arm, that fact clearly does not preclude them from making claims which read broadly on such machines as alternative embodiments of their invention.

In addition, the Court notes that the plaintiff has paid little attention to this assertion[21] and has been unable to cite one case which has applied § 102(a) in the context of late claiming. Similarly, the late claiming cases examined by the Court have all dealt with situations where the Court has applied § 102(b), with its one year bar, to allegations of late claiming.

For the reasons stated above, the Court is of the opinion that the defense of late claiming has not been established in this case and that the defendants are entitled to a judgment that the patent is valid over said defense.

## IV. CONCLUSION

The above represents the Court's findings of fact and conclusions of law with respect to the separately tried issues of "on sale" and late claiming. The Court has held the patent valid over these claims and the defendants are accordingly awarded a judgment on these issues. There are, however, other issues remaining to be tried in this

---

20. This finding does not mean that other claims of the April 26, 1961 amendment are not broad enough to cover indirect tool changing. Since such coverage is so clear in Claim 6, the Court considers it unnecessary to discuss these other claims.

21. When this issue was raised by defendants' counsel in closing argument, plaintiff's counsel did not respond to it in his rebuttal.

case and it should be understood that this opinion does not and is not intended to resolve any of those remaining issues.